[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 21-14396

_____

ROLAND EDGER,

                                                                  Plaintiff-Appellant,

*versus*

KRISTA MCCABE,
THE CITY OF HUNTSVILLE, ALABAMA,
CAMERON PERILLAT,

                                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:19-cv-01977-LCB

_____

Before WILSON, JILL PRYOR, Circuit Judges, and COVINGTON,[*] District Judge.

WILSON, Circuit Judge:

Roland Edger brought both a § 1983 false arrest claim and a state law false arrest claim against two Huntsville, Alabama police officers and the City itself. After the district court concluded that the officers were entitled to qualified immunity because they had arguable probable cause to arrest Mr. Edger, he appealed. After careful review of the record and with the benefit of oral argument, we **REVERSE** the district court's grant of qualified immunity.

### I.

#### A.

The facts of this case are not in dispute, as the entirety of the encounter between Mr. Edger and the police was captured on the police officers' body-worn and dash cameras. Both Mr. Edger and the defendants agree that the video and audio evidence from these cameras is authentic. Before turning to that evidence, we must first detail the events leading up to the start of the recordings.

Mr. Edger is a mechanic in Huntsville, Alabama, where he manages the Auto Collision Doc store. One of Mr. Edger's

---

[*] Honorable Virginia M. Hernandez Covington, United States District Judge for the Middle District of Florida, sitting by designation.

longtime clients is Kajal Ghosh, who owns a red Toyota Camry.[1] The Camry is primarily driven by Mr. Ghosh's wife, who works as a teacher at Progressive Union Missionary Baptist Church. One or two days before June 10, 2019, Mr. Ghosh called Mr. Edger and reported that the Camry had broken down while his wife was working at the Church. He asked Mr. Edger to fix the car and told him the keys would be waiting for him at the Church's front office.

On June 10, around 2 p.m., Mr. Edger went to the Church to pick up the keys and to inspect the Camry. He determined something was wrong with either the car's steering or its tires, and he concluded he would need to come back later with tools to fix the car. That evening, he returned to the Church with his stepson, Justin Nuby, in tow, intending to either fix the Camry on-site or to take it back to the shop for further repairs. Mr. Edger and Mr. Nuby drove a black hatchback to the Church.

After Mr. Edger and his stepson entered the Church's lot, the Church's security guard observed them and grew concerned. From here on, the facts of this case were captured by audio and visual recording devices. At about 8:05 p.m., the security guard called 911 and told dispatch: "I have two Hispanic males, messing with an employee's car that was left on the lot." He also noted that

---

[1] In the record, the owner of the car on which Mr. Edger was working is referred to by various combinations of the names "Ghosh," "Kajal," "Ghosh Patel," and "Mr. Patel." For consistency, we will refer to this individual as Kajal Ghosh, or Mr. Ghosh, as that is the name by which he identified himself in his deposition.

he observed them remove a tire from the car. During the 911 call, the guard identified himself as a security guard for the Church, gave his phone number, noted his employer, and gave a description of Mr. Edger and Mr. Nuby. About 30 minutes later, at 8:36 p.m., Officer Krista McCabe arrived at the Church in her patrol car.

As Officer McCabe's body camera shows, she pulled into the Church parking lot and parked in front of where Mr. Edger and Mr. Nuby were working. McCabe Body Camera at 0:00:30.[2] As she stepped out of the squad car, Mr. Edger was laying on the ground next to the car, with the Camry's tire removed. *Id.* at 0:00:36. Mr. Nuby greeted Officer McCabe as she exited her vehicle and approached the Camry. *Id.* at 0:00:36–0:00:46. Mr. Edger continued to work, and the following conversation began:

> **Officer McCabe:** What are y'all doing?
>
> **Mr. Edger:** Getting the car fixed.
>
> **Officer McCabe:** Is this your car?
>
> **Mr. Edger:** Yeah, well, it is one of my customer's.
>
> **Officer McCabe:** One of your customer's?
>
> **Mr. Edger:** Ghosh Patel, yep. I was over here earlier.

---

[2] Officer McCabe's body camera footage is available online. *See* Video – Investigating Officer Body Camera, Doc. 28-9 (https://www.ca11.uscourts.gov/media-sources).

21-14396               Opinion of the Court                5

*Id.* at 0:00:47. At this point Officer McCabe gestured towards the black hatchback.

> **Officer McCabe:** Whose car is that?
>
> **Mr. Edger:** That's mine.
>
> **Officer McCabe:** The black one?
>
> **Mr. Edger:** Yeah.

*Id.* at 0:01:03. Officer McCabe then watched in silence as Mr. Edger attempted to jack the Camry up. Eventually the car slipped from the jack and slammed into the ground. *Id.* at 0:01:08–0:01:48. Immediately after the Camry slipped, Officer Perillat arrived at the scene in a squad car. He exited his car and approached on foot, positioning himself behind Mr. Edger, out of Mr. Edger's line of vision. From here, the interaction rapidly escalated:

> **Officer McCabe:** Alright. Take a break for me real fast and do y'all have driver's license or IDs on you?
>
> **Mr. Edger:** I ain't going to submit to no ID. Listen, you call the lady right now. Listen I don't have time for this. I don't mean to be rude, or ugly, but . . .
>
> **Officer McCabe:** Okay. No, you need to—
>
> **Mr. Edger:** I don't mean to be—
>
> **Officer McCabe:** —give me your ID or driver's license.

> **Mr. Edger:** No. I don't. Listen, I don't want you to run me in for nothing.
>
> **Officer McCabe:** Are you refusing me—are you refusing to give me your ID or driver's license?
>
> **Mr. Edger:** I'm telling you that if you will call this lady that owns this car—

In the middle of Mr. Edger's sentence, as he was attempting to explain the situation to Officer McCabe, Officer Perillat seized Mr. Edger from behind. He led Mr. Edger to the side of the Camry and started handcuffing him. As Mr. Edger protested, Officer Perillat told Mr. Edger: "We don't have time for this," and, "You don't understand the law." During this time, the video shows that Mr. Edger offered his driver's license at least three times before the officers could finish handcuffing him. Eventually, the officers managed to handcuff and search Mr. Edger, and then detain him in a squad car. Throughout this process, the officers never asked Mr. Edger or his stepson for their names or addresses. *Id.* at 0:00:44–0:02:16.

B.

Mr. Edger was charged with obstructing governmental operations in violation of Alabama Code § 13A-10-2(a)(1). The City of Huntsville dropped all charges relating to this incident.

After the dismissal of the charges, Mr. Edger filed a § 1983 civil rights lawsuit, alleging a false arrest in violation of his Fourth Amendment rights against unlawful searches and seizures, as well

as a state law false arrest claim. On cross-motions for summary judgment, the district court found that the defendants were entitled to federal and state law immunities. It reasoned that even though Mr. Edger committed no acts giving rise to *actual* probable cause, a reasonable but mistaken officer could nonetheless have believed his refusal to produce physical identification was a crime, and the officers thus had *arguable* probable cause to make the arrest. This appeal followed.

## II.

We review summary judgment rulings de novo, applying the same legal tests as the district court. *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017).

## III.

We focus on the federal claims first. In general, when government officials are performing discretionary duties, as all parties concede they were in this case, they are entitled to qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). A plaintiff may rebut this entitlement by showing that the government officials (1) committed a constitutional violation; and (2) that this violation was "clearly established" in law at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In theory, this judge-made doctrine is designed to protect government officials from the consequences of their reasonable mistakes made in the exercise of their official duties. *See id.* at 231. The test is conjunctive, and if a plaintiff fails either prong of the qualified immunity analysis, his claim is barred.

8                      Opinion of the Court                      21-14396

There are three recognized ways to show that a law is "clearly established." First, a plaintiff may show that a "materially similar case has already been decided," whose facts are similar enough to give the police notice. *See Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010). Second, he may show that a "broader, clearly established principle should control the novel facts" of his case. *Id.* This "broader" principle may be derived from "general statements of the law contained within the Constitution, *statute*, or caselaw." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (alteration adopted) (emphasis added) (quoting *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003)). Finally, a plaintiff may show that the officer's conduct "so obviously violates [the] constitution that prior case law is unnecessary." *Keating*, 598 F.3d at 766 (quoting *Mercado*, 407 F.3d at 1159). While we must be mindful of the "specific context of the case," we "do[] not require a case directly on point for a right to be clearly established." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (per curiam).

Mr. Edger alleges that he was falsely arrested in violation of his Fourth Amendment rights against unreasonable searches and seizures. For Fourth Amendment purposes, arrests are seizures and are unreasonable unless supported by probable cause. *See Davis v. Williams*, 451 F.3d 759, 764 n.8 (11th Cir. 2006); *Morris v. Town of Lexington*, 748 F.3d 1316, 1324 (11th Cir. 2014). Probable cause exists where "facts and circumstances within the officer's knowledge . . . would cause a prudent person to believe" that a crime was being committed. *Morris*, 748 F.3d at 1324.

In the false arrest context, we have often said that an officer is entitled to qualified immunity if he had even "arguable probable cause," meaning that "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." *See, e.g.*, *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) (discussing the qualified immunity standard). We have recently clarified, that having "arguable probable cause" is just another way of saying that the law is not "clearly established." *See Garcia v. Casey*, 75 F.4th 1176, 1187 (11th Cir. 2023) ("[T]he arguable probable cause inquiry in a false arrest case is no different from the clearly established law inquiry in any other qualified immunity case."). Thus, if we conclude that the officers had arguable probable cause then we conclude that their violation of the law was not clearly established and vice-versa.

Applying these principles to this case, Mr. Edger was charged with obstructing governmental operations in violation of Alabama Code § 13A-10-2(a)(1). A person violates this section if, "by means of intimidation, physical force or interference or by any other *independently unlawful act*, he" obstructs a governmental function. *Id.* (emphasis added). Our inquiry therefore asks whether the officers had probable cause to believe Mr. Edger obstructed governmental operations in violation of this statute. If not, our inquiry is whether no reasonable officer would believe that Mr. Edger obstructed governmental operations—or in other words, whether it was clearly established that there was no probable cause to arrest Mr. Edger for this crime.

The defendants argue that they had probable cause to arrest Mr. Edger for violating § 13A-10-2(a)(1) on two theories. First, they argue that Mr. Edger used "physical force or interference" to obstruct the officer's investigation. Second, in the alternative, they argue that Mr. Edger committed an "independently unlawful act" by refusing to identify himself as Officer McCabe ordered. They propose two different statutes, the Alabama Stop-and-Identify statute § 15-5-30, and the Alabama driver's license statute § 32-6-9, for why Mr. Edger was required to produce his identification. The officers are entitled to qualified immunity if they had arguable probable cause to arrest Mr. Edger based on any of these theories. We address whether the officers had arguable probable cause for each of these theories in turn.

*A.*

Turning first to the theory that Mr. Edger obstructed the officers by using "intimidation" of "physical force." First, the defendants argue that Mr. Edger's noncompliance and "aggressive demeanor" obstructed Officer McCabe's investigation and provided her probable cause to arrest Mr. Edger. But "words alone fail to provide culpability under" Alabama's obstruction statute. *D.A.D.O. v. State*, 57 So. 3d 798, 806 (Ala. Crim. App. 2009). So, Mr. Edger's statements and noncompliance without more do not begin to provide "facts or circumstances" to support probable cause.

Second, the defendants suggest that Mr. Edger physically threatened Officer McCabe in the moments following the Camry slipping off the jack and hitting the ground because he "jumped up"

21-14396               Opinion of the Court                        11

and "waved his hands," among other things. But the video evidence in this case speaks for itself. *See Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1290 n.3 (11th Cir. 2009) (noting we review video evidence de novo); *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (explaining that where one party's account is contradicted by the video evidence "[t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape"). The final interaction between Mr. Edger and Officers McCabe and Perillat is depicted from four separate angles on four separate cameras—two body-worn police cameras and two dash cameras. In each video, the Camry slips off the jack, slamming into the ground in front of Mr. Edger. In each, he stands up, slapping his leg, and turns to answer Officer McCabe's questions. Though he is clearly frustrated and gesturing as he speaks, his hands are empty. He stands in one spot without walking towards Officer McCabe. Looking to all the facts within the officer's knowledge at the time of the incident, no reasonable officer could have observed Mr. Edger and believed he was using "intimidation" or "physical force" to "intentionally obstruct[]" Officer McCabe's investigation. Accordingly, no reasonable police officer could believe that Mr. Edger violated this portion of the obstruction statute, and therefore there was not even arguable probable cause—much less actual probable cause—to support Mr. Edger's arrest. This theory does not support the grant of qualified immunity to the officers.

B.

Turning now to the defendant's theory that probable cause existed to support Mr. Edger's arrest because he violated Alabama's Stop-and-Identify statute, Alabama Code § 15-5-30.  The Stop-and-Identify statute allows an Alabama police officer who "reasonably suspects" a crime is being, has been, or is about to be committed to stop a person in public and "demand of him his name, address and an explanation of his actions."  *Id.*

Mr. Edger argues that he cannot possibly have violated § 15-5-30, because it clearly delineates three things the police may ask him for: his name, his address, and an explanation of his actions. He argues nothing in the statute requires him to produce physical identification, and that Officer McCabe's question, "Do y'all have driver's license or IDs on you?" and repeated references to "IDs" were clearly demands for him to produce physical identification of some kind.  He notes that physical identification is not one of the three enumerated things that the police may ask for under Alabama law, and that he was never asked for his name or address.

We agree with the district court's assessment that Mr. Edger did not actually violate § 15-5-30 and thus did not actually commit an "independently unlawful act" justifying arrest under § 13A-10-2(a)(1).  Section 15-5-30 does not require anyone to produce an "ID" or "driver's license" as Officer McCabe demanded.  Indeed, it does not require anyone to produce anything.  Instead, it grants Alabama police the authority to request three specific pieces of information.  Here, the video evidence is clear that neither Officer

McCabe nor Officer Perillat asked for Mr. Edger's name or address. Additionally, Mr. Edger's objection was clearly related to the unlawful demand that he produce physical identification. When asked, "What are y'all doing?" he responded to Officer McCabe and explained they were fixing the car and that it belonged to a customer. When he stood up to answer more of her questions, the video shows he continued explaining who the owner of the car was and began explaining how they could verify the information before he was abruptly arrested by Officer Perillat. Because the Alabama statute, by its plain text, does not permit the police to demand physical identification, the officers lacked probable cause and thus violated Mr. Edger's Fourth Amendment rights by arresting him. The first prong of the qualified immunity analysis is therefore satisfied.

Where we part ways with the district court is on the issue of arguable probable cause or the "clearly established law" prong of the qualified immunity analysis. We hold that the plain text of the Alabama statute is so clear that no reasonable officer could have believed they could arrest Mr. Edger for failing to produce his "ID" or "driver's license" under § 15-5-30.

Three related premises lead us to this conclusion. First, the broad background rule is that the police may ask members of the public questions and make consensual requests of them, *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991) (collecting cases and examples), "as long as the police do not convey a message that compliance . . . is required." *Id.* at 435. But the person "need not answer any question put to him; indeed, he may decline to listen to questions at all

and may go on his way." *Florida v. Royer*, 460 U.S. 491, 497–98 (1983).

Second, while the Fourth Amendment permits the police to briefly detain a person to investigate criminal activity, any obligation to answer police questions arises from state—not federal Constitutional—law. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 187 (2004) (analyzing Nevada's Stop-and-Identify statute and noting "the source of the legal obligation [to answer] arises from Nevada state law, not the Fourth Amendment").

Finally, as noted, the Alabama statute is clear. It lists only three things that the police may ask about. This is not an issue of "magic words" that must be uttered. There is a difference between asking for specific information: "What is your name? Where do you live?" and demanding a physical license or ID. The information contained in a driver's license goes beyond the information required to be revealed under § 15-5-30. *Compare* Ala. Code § 32-6-6 ("Each driver license . . . shall contain a distinguishing number assigned to the licensee and a color photograph of the licensee, the name, birthdate, address, and a description of the licensee . . . ."), *and* Ala. Code § 22-19-72 (requiring that there be "a space on each driver's license . . . to indicate in appropriate language that the [licensee] desires to be an organ donor"), *with* Ala. Code § 15-5-30 ("A [police officer] may stop any person abroad in a public place whom he reasonably suspects is committing . . . a [crime] and may demand of him his name, address and an explanation of his actions."). Further, neither the parties nor our own research can identify any

21-14396               Opinion of the Court                    15

Alabama law that generally requires the public to *carry* physical identification—much less an Alabama law requiring them to produce it upon demand of a police officer. There simply is no state law foundation for Officer McCabe's demand that Mr. Edger produce physical identification.

So to summarize, it has been clearly established for decades prior to Mr. Edger's arrest that the police are free to ask questions, and the public is free to ignore them. It has been clearly established prior to Mr. Edger's arrest that any legal obligation to speak to the police and answer their questions arises as a matter of state law. And the state statute itself in this case is clear and requires no additional construction: police are empowered to demand from an individual three things: "name, address and an explanation of his actions." Ala. Code § 15-5-30. It was thus clearly established at the time of Mr. Edger's arrest that she could not demand he produce physical identification. And because Officer McCabe's demands for an "ID" or a "driver's license" went beyond what the statute and state law required of Mr. Edger, she violated clearly established law. Under this set of facts and these precedents, no reasonable officer could have believed there was probable cause to arrest Mr. Edger for obstructing governmental operations by violating § 15-5-30. And this theory cannot support the grant of qualified immunity to the officers.

C.

Finally, the defendants also argue that Mr. Edger violated the Alabama driver's license statute, Ala. Code § 32-6-9(a), which

requires those "driving" to "display the [license], upon demand of a . . . peace officer." *Id.* The defendants argue that because Mr. Edger admitted that the black hatchback was his, that he must have driven it there and he was therefore "driving" and subject to the requirement to display his license. They argue this constitutes an "independently unlawful act" under § 13A-10-2(a)(1) and a crime in and of itself justifying the arrest.

The defendants argue that "driving" is a broad term also encompassing those with "actual physical control" of the vehicle. Appellee Br. at 33 (citing Ala. Code § 32-1-1.1(14) (defining "driver")). The test for "actual physical control" means the "exclusive physical power, and present ability, to operate, move, park, or direct" the vehicle under the totality of the circumstances. *Davis v. State*, 505 So. 2d 1303, 1305 (Ala. Crim. App. 1987). Assuming without deciding that this is the appropriate test for determining if someone is "driving" under § 32-6-9,[3] under the totality of the circumstances, Mr. Edger was not driving. When Officer McCabe arrived on scene, she found Mr. Edger partially under the Camry attempting to jack it up. The Camry itself had a wheel removed and was thus disabled and incapable of being driven. The black hatchback was approximately two parking spaces away from where Mr. Edger was, and he was engaged in working on the Camry. No reasonable person could believe that Mr. Edger had the "present ability . . . to

---

[3] We note that the defined term "driver" does not appear in § 32-6-9, and the term "driving" is undefined in § 32-1-1.1. *Compare* Ala. Code § 32-6-9, *with id.* § 32-1-1.1(14).

operate, move, park, or direct" the black hatchback from two parking spaces away and underneath another car. *See Davis*, 505 So. 2d at 1305. The only case analyzing § 32-6-9 cited by the defendants is from this court, *Cantu v. City of Dothan*, 974 F.3d 1217, 1230 (11th Cir. 2020), where we concluded the police *may* have had probable cause to arrest someone for failure to display their license. But that case's facts are materially different because, there, the arrest attempt occurred after the individual walked towards their vehicle and attempted to get in before being stopped by the officer. *Id.* at 1223.

In sum, there was not actual probable cause to believe that Mr. Edger was driving a car without displaying his license at the time Officer McCabe arrived. Nor could any reasonable officer believe so based on the facts in this case, and therefore there was no arguable probable cause either. Thus, this final theory cannot support the grant of qualified immunity to the officers.

★ ★ ★

In summary, Officers McCabe and Perillat violated Mr. Edger's clearly established Fourth Amendment rights when they arrested him with neither actual, nor arguable, probable cause. Accordingly, we **REVERSE** the district court's grant of qualified immunity to the officers and remand for further proceedings.

## IV.

The district court dismissed Mr. Edger's state law claims against Officer McCabe, Officer Perillat, and the City because it determined that arguable probable cause was a defense to those

claims as well. It did not conduct any independent analysis on these claims and instead linked its decision directly to the finding of arguable probable cause on the federal claims. Accordingly, because we hold that there was no arguable probable cause—i.e., the lack of probable cause was clearly established—we **VACATE** the district court's dismissal of the state law claims and remand for further proceedings.

**REVERSED and VACATED.**